## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on July 9, 2018**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **CRIMINAL NO.** |
| | ) **Grand Jury Original** |
| **v.** | ) |
| | ) **VIOLATIONS:** |
| **ANDRE DE MOYA,** | ) |
| (Counts 1, 3-9) | ) **Count 1: 18 U.S.C. § 371** |
| | ) **(Conspiracy)** |
| **ANTHONY MERRITT, and** | ) |
| (Counts 1-9) | ) **Count 2: 18 U.S.C. §§ 201(b)(2)(A) & (C), 2** |
| | ) **(Bribery)** |
| **VINCENT SLATER** | ) |
| (Counts 1-2, 4-9) | ) **Count 3: 18 U.S.C. §§ 201(b)(1)(A) & (C), 2** |
| | ) **(Bribery)** |
| | ) |
| | ) **Counts 4-9: 18 U.S.C. §§ 1343, 1346** |
| | ) **(Honest Services Wire Fraud)** |
| | ) |
| **Defendants.** | ) **18 U.S.C. § 981(a)(1)(C), 28 U.S.C.** |
| | ) **§ 2461(c), and 21 U.S.C. § 853(p)** |
| | ) **(Criminal Forfeiture)** |

## INDICTMENT

The Grand Jury charges that:

At all times material to this indictment:

### Introduction

*Office of Tax and Revenue Structure*

1.     The Office of Tax and Revenue (OTR) was an agency of the government of the District of Columbia responsible for the administration of local taxes for individuals and businesses. OTR's Compliance Administration hosted several divisions and units, including the Collection Division, the Audit Division, and, within the Criminal Investigations Division, the Adjustment Unit.

2.      The mission of the Collection Division was to promptly collect the proper amount of tax from all individuals and businesses as required by the District of Columbia. This mission included identifying non-filers—individuals and businesses who had a requirement to file and had failed to do so.

3.      The mission of the Audit Division was to obtain, maintain, and achieve tax compliance with all District of Columbia tax laws, except real property taxes, through the examination of filed tax returns, identification of non-filers, and unreported tax revenue.

4.      The mission of the Criminal Investigations Division was to investigate potential criminal violations of District of Columbia tax laws.  In 2011, in order to limit opportunities for corrupt employees to collude with taxpayers to engage in fraud, OTR established an Adjustment Unit within the Criminal Investigations Division.  The creation of the Adjustment Unit ended the ability of employees in other Compliance Administration divisions to make adjustments (for instance, transfers of credits; abatements or waivers of penalties, fees, or interest; offsets; or correction of data entry errors) to taxpayer accounts.  Instead, Collection and Audit Division employees were required to support their requests for adjustments with documentation and supervisory approval, and then to submit these materials to Adjustment Unit employees for consideration and further action.  Adjustment Unit employees were selected because they were proficient in the processes of the Compliance Administration.

*Business Tax Obligations*

5.      Businesses operating in the District of Columbia were required to pay a variety of business-related taxes and fees, including but not limited to sales and use taxes and franchise taxes. Food and beverages sold for immediate consumption, including meals and liquor sold on the premises, were subject to a ten percent sales and use tax, which the business collected at the time

of purchase and was required to remit to the D.C. government. The frequency with which a business was required to file and pay sales and use taxes to the D.C. Government was based on its revenue.

6.     The District of Columbia Clean Hands Law provided that an applicant for a license or permit could not owe more than $100 to the District government. A business was required to provide a Clean Hands certification form—a certification issued by OTR attesting that the business was in compliance with the Clean Hands Law, and was thus in good standing—with any application for a license or permit in the District of Columbia.

7.     A business that did not pay its taxes on time was subject to penalties and interest.

*OTR's Management of Delinquent Taxpayer Accounts*

8.     At the beginning of the acts described below, OTR used a computer database called the Integrated Tax System (ITS) to manage taxpayer accounts. In or about October 2016, OTR migrated corporate franchise tax accounts from ITS to a new computer system called the Modernized Integrated Tax System (MITS). On or about October 27, 2017, OTR migrated sales and use tax accounts to MITS. Any OTR employee using ITS or MITS received a unique log-in, and any adjustments made by that employee were associated with the employee's log-in and tracked.

9.     In ITS, if a taxpayer filed a return and did not pay the amount due, the system automatically generated a deficiency notice and mailed it to the taxpayer. If the taxpayer still did not pay the balance after this first notice, a second bill was sent by the system. If the second bill remained unpaid, OTR's Collection Division was notified of the deficient tax period. A revenue officer might then have been assigned to the case for the specific delinquent tax period and made contact with the taxpayer to request payment and take collection steps such as liens, levies, and garnishments.

10.    Deficient taxpayers could request a payment plan, meaning an agreement to pay delinquent taxes in installments over a defined period of time. A payment plan had to be approved by the supervisor of the Collection Division and the case had to be assigned to a revenue officer. Payment plans required the taxpayer to pay all outstanding taxes, including penalties and interest; any request for a waiver of penalties had to be made in writing and supported by reasonable cause. A waiver of penalties would not be approved if the taxpayer was not in good standing — for example, if the taxpayer had previously failed to report liabilities owed or had a history of paying with bad checks. When making installment payments, taxpayers were expected to continue to also pay their current taxes.

11.    Deficient taxpayers could also request an Offer in Compromise (OIC). An OIC was an agreement between the taxpayer and OTR that allowed the taxpayer to settle the taxpayer's debt for less than the full amount owed. Among other factors, a business was eligible for an OIC only if it: (a) had exhausted all other avenues of appeal regarding the validity or amount of the assessment; (b) was current with all tax returns it was legally required to file; and (c) was either without resources or unable to apply present and/or future resources to paying the outstanding tax liability. A taxpayer's request for an OIC had to be made in writing and address all of the reasons the taxpayer could not pay the taxes due, and required supporting documentation. When an OIC was accepted, the taxpayer was still obligated to file and pay all future tax obligations.

*Relevant Individuals*

12.    Defendant VINCENT SLATER was a senior revenue officer at OTR and the supervisor of the Adjustment Unit. As a public official, SLATER owed a fiduciary duty to the District of Columbia, OTR, and District citizens to perform the duties and responsibilities of his office in the best interests of the District of Columbia, OTR, and the citizens of the District.

4

13.    Defendant ANTHONY MERRITT was a former employee of the District of Columbia Department of Consumer and Regulatory Affairs (DCRA), the District of Columbia agency responsible for, among other things, business permits and alcohol licenses. Upon separation from DCRA in or about 2012, MERRITT held himself out as a consultant and "expediter" who, for a fee, could assist businesses in obtaining business permits and licenses quickly.

14.    Defendant ANDRE DE MOYA was an owner of interests in several businesses located in the District of Columbia. From in or about 2010 to in or about 2012, DE MOYA owned an interest in 1716 I LLC, which operated a bar and nightclub called Eden Lounge. From in or about 2013 to in or about 2017, DE MOYA owned an interest in 1720 I LLC, which operated a bar and restaurant called Café Asia. Starting in or around 2012, DE MOYA owned an interest in Ekho Events, Inc., which operated a concert venue called Echostage. All of these businesses were required to pay sales and use taxes on a monthly basis, including ten percent of the gross receipts from the sale of food and beverages, which taxes were collected by the businesses at the point of purchase on behalf of the District of Columbia.

15.    Chao Charles Zhou was an owner of interests in several businesses located in the District of Columbia. From in or about 2007 to in or about 2014, Zhou owned an interest in Zhou Hospitality LLC, which operated Muse Nightclub. Beginning in or around 2010, Zhou (along with DE MOYA until in or about 2012) owned an interest in 1716 I LLC. From in or about 2010 to in or about 2017, Zhou (along with DE MOYA) owned an interest in 1720 I LLC. Starting in or about 2013, Zhou owned an interest in Zhou Hospitality Group LLC, which operated a bar and restaurant called Umaya. All of these businesses were required to pay sales and use taxes on a monthly basis, including ten percent of the gross receipts from the sale of food and beverages, which taxes were collected by the businesses at the point of purchase on behalf of the District of Columbia.

16.    Arman Amirshahi was an owner of interests in several businesses located in the District of Columbia.  Beginning in or about 2009, Amirshahi owned an interest in Toppromo, Inc., which operated a nightclub called Ultrabar.  Starting in or about 2010, Amirshahi owned an interest in Barcode Corporation, which operated a restaurant, bar, and lounge called Barcode.  Starting in or about 2012, Amirshahi (along with DE MOYA) owned an interest in Ekho Events, Inc. Beginning in or about 2015,   Amirshahi owned an interest in 727 Concept LLC, which operated a nightclub called L8 Lounge.  All of these businesses were required to pay sales and use taxes on a monthly basis, including ten percent of the gross receipts from the sale of food and beverages, which taxes were collected by the businesses at the point of purchase on behalf of the District of Columbia.

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

17.    The introductory allegations set forth in paragraphs 1 through 16 are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy

18.    From in or about March 2012 through in or about December 2017, in the District of Columbia and elsewhere, the defendants,

**VINCENT SLATER,**
**ANTHONY MERRITT, and**
**ANDRE DE MOYA**

with others known and unknown, did knowingly and unlawfully conspire, confederate, and agree together and with each other to commit one or more of the following offenses against the United States:

a.    to directly and indirectly, corruptly give, offer, and promise anything of value to SLATER, a public official, to influence an official act and to induce such public official to do and

omit to do any act in violation of his lawful and official duty, in violation of Title 18, United States Code, Section 201(a)(2); and

      b.   for SLATER, being a public official, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act and to be induced to do and omit to do any act in violation of his lawful and official duty, in violation of Title 18, United States Code, Section 201(b)(2); and

      c.   to devise and intend to devise and execute a scheme and artifice to defraud the District of Columbia of money and property, and to defraud and deprive the District of Columbia, OTR, and District citizens of the honest services of SLATER, a public official, through bribery, in violation of Title 18, United States Code, Sections 1343 and 1346.

### Purposes of the Conspiracy

19.    A purpose of the conspiracy was for MERRITT, Zhou, Amirshahi, and DE MOYA to enrich themselves by paying money to SLATER, often through MERRITT, in exchange for SLATER fraudulently reducing the tax liabilities of the businesses of Zhou, Amirshahi, and DE MOYA.

20.    A purpose of the conspiracy was for SLATER to enrich himself by soliciting and accepting money, often through MERRITT, in exchange for fraudulently reducing the tax liabilities of the conspirators' businesses.

### Manner and Means

21.    The conspiracy was carried out through the following manner and means, among others:

a.   SLATER used a middleman, MERRITT, to broker bribe agreements, collect bribe payments, and communicate with DE MOYA, Zhou, and Amirshahi.

b.   DE MOYA, Zhou, and Amirshahi agreed to pay bribes to SLATER, usually through MERRITT, so that SLATER would use his official position at OTR to fraudulently reduce or eliminate taxes or tax-related liabilities of the businesses, or to facilitate the businesses' evasion of their tax obligations.

c.   SLATER used his knowledge of District of Columbia tax laws, ITS, and OTR processes and procedures to devise different methods of fraudulently reducing or eliminating businesses' taxes and tax-related liabilities, including:

    i.   SLATER, who himself was not permitted and was unable to make adjustments in ITS, caused fraudulent adjustments to be made to taxpayer accounts in ITS by using the ITS log-ins of employees he supervised.  In some instances, the adjustments would result in the creation of false and fraudulent tax credits that SLATER would cause to be applied against the taxpayer's current tax and tax-related liabilities.  In other instances, the adjustments would result in the fraudulent abatement, reduction, or reversal of a taxpayer's current tax and tax-related liabilities.

    ii.   In at least one instance, SLATER transferred a false and fraudulent tax credit to cover the liabilities of another business owned by the same individual or group of individuals.

    iii.   SLATER created and authorized an OIC and payment plan in which he falsely identified himself as a supervisor of the Collection Division, because as supervisor of the Adjustment Unit he did not have authority to perform

collection actions, and vastly reduced the business's sales and use tax and tax-related liabilities although the business had failed to demonstrate it was eligible for an OIC under OTR processes and procedures.

d.    SLATER used his official position, including his knowledge of District of Columbia tax laws, ITS, and OTR processes and procedures, to promote a fraud upon the District of Columbia and its citizens and to facilitate businesses' evasion of their taxes without consequence, including by encouraging his co-conspirators not to file tax returns and advising them on how to avoid being caught.  In so doing, SLATER violated his lawful and official duty to enforce District tax laws.

### Overt Acts

22.    In furtherance of the conspiracy, and to effect its objects and purposes, SLATER, MERRITT, DE MOYA, Zhou, Amirshahi, and others committed the following overt acts, among others, in the District of Columbia, and elsewhere:

### SLATER'S Acts on behalf of Businesses Owned by Zhou or Zhou and DE MOYA

23.    In or about March 2012, Zhou, who had fallen behind in paying monthly sales and use taxes for some of his businesses, learned from DE MOYA that, based on DE MOYA's previous experience, MERRITT could assist 1716 I LLC and 1720 I LLC in resolving their outstanding tax and tax-related liabilities with OTR in exchange for a fee.

24.    Thereafter, beginning on or about July 2012, Zhou engaged with MERRITT in a pattern of bribery, in which Zhou would give MERRITT a check payable to the D.C. Treasurer covering only a fraction of Zhou's businesses' outstanding sales and use tax and tax-related liabilities, accompanied by cash intended for payment to a public official at OTR, later identified to Zhou as SLATER, to improperly reduce or eliminate the tax and tax-related liabilities of Zhou's businesses.

*SLATER's Fraudulent Adjustments for 1716 I LLC and 1720 I LLC in April 2014*

25.     In or about April 2014, SLATER fraudulently reduced the tax and tax-related liabilities of 1716 I LLC and 1720 I LLC in exchange for a cash payment made by Zhou through MERRITT, as follows.

26.     In or about April 2014, MERRITT told Zhou that 1716 I LLC and 1720 I LLC were both on an OTR non-compliance collections list as a result of their outstanding tax and tax-related liabilities.  For himself and for SLATER, MERRITT demanded that Zhou pay approximately $5,000 to fraudulently reduce the businesses' liabilities.  Zhou agreed.

27.     On or about April 24, 2014, MERRITT and SLATER, and MERRITT and Zhou, exchanged phone calls and text messages.

28.     On or about April 25, 2014, MERRITT and SLATER exchanged numerous text messages between approximately 9:35 a.m. and 10:04 a.m.

29.     Less than 20 minutes after MERRITT and SLATER'S text messages, beginning at approximately 10:25 a.m. on or about April 25, 2014, SLATER caused six fraudulent adjustments in ITS:  three abatements reducing the liabilities of 1716 I LLC for tax periods August, October, and December 2013, and a liability write-off and two abatements reducing the liabilities of 1720 I LLC for tax periods February 2011, November 2013, and December 2013.

30.     Immediately after these fraudulent adjustments, at approximately 10:32 a.m. on or about April 25, 2014, SLATER browsed ITS's records for 1716 I LLC and 1720 I LLC.  Within an hour, SLATER sent MERRITT a text message and the two began to send text messages back and forth as SLATER continued to browse 1716 I LLC and 1720 I LLC's accounts in ITS.

31.     At approximately 3:57 p.m. on or about April 25, 2014, to show that SLATER had reduced outstanding tax and tax-related liabilities of Zhou's businesses in exchange for the $5,000

payment, SLATER sent Zhou an email in which he wrote, "Attached are the original statement of accounts before the adjustments." SLATER attached statements of account for April 23, 2014, reflecting outstanding balances of $9,735.50 and $21,928.74 for 1716 I LLC and 1720 I LLC, respectively.

*SLATER's Fraudulent Adjustments for 1716 I LLC and 1720 I LLC in January 2016*

32.     In or about January 2016, in exchange for the cash payments from Zhou through MERRITT, SLATER made fraudulent adjustments to the tax and tax-related liabilities of 1716 I LLC and 1720 I LLC, as follows.

33.     In or about January 2016, after an OTR Collection Division employee attempted a field visit to one of the businesses, Zhou, MERRITT, and SLATER communicated several times by text and phone.

34.     After those communications, on or about January 27, 2016, SLATER caused 19 different fraudulent adjustments in ITS to 1716 I LLC's previous tax periods, including abatements and offsets. At approximately 12:50 p.m., SLATER caused a note to be created in ITS falsely claiming that "OFFSETS PERFORMED TO CANCEL TAX BILLS FOR MULTIPLE S/U P/E. PAYMENTS POSTED TO INCORRECT ACCT 350000073666. TAX BILLS HAVE BEEN CANCELLED PER REQUEST."

35.     Beginning at approximately 1:10 p.m. on or about January 27, 2016, SLATER caused 25 different fraudulent adjustments in ITS to 1720 I LLC's previous tax periods, including abatements and offsets. At approximately 1:12 p.m., SLATER caused a note to be created in ITS falsely claiming that "NEGATIVE ASSESSMENT CREATED ON S/U P/E 2/2011. AS RESULT CREATED CREATED WHICH WAS OFFSET TO MULTIPLE S/U P/E WHICH CANCELLED THE TAX BILLS FOR S/U ACCT PER REQUEST."

36.     At approximately 1:20 p.m. on or about January 27, 2016, beginning approximately eight minutes after the note regarding 1720 I LLC, SLATER browsed the accounts of both 1716 I LLC and 1720 I LLC.

### SLATER Provides Fraudulent Clean Hands Certificates for 1716 I LLC and 1720 I LLC in August 2016

37.     In or about August 2016, in exchange for cash payments from Zhou through MERRITT, SLATER provided Zhou with fraudulent Clean Hands certificates for 1716 I LLC and 1720 I LLC, as follows:

38.     On or about August 15, 2016, Zhou called MERRITT, and they shared a two-minute phone call.

39.     Later that same day, MERRITT and SLATER had the following conversation by text message:

| | |
|---|---|
| MERRITT: | Only person that hit me was Charles.  He wants a clean hands on one of his joints.  He wants to know how much he owes. |
| SLATER: | He always wants something lol |
| MERRITT: | Yes LAWRD.  I told him we can find out but what ever it is . Soon as we find out he gotta have it all right then and there !! Nothing less |
| SLATER: | Exactly |
| MERRITT: | Don't worry I'm stepping on heads now |
| SLATER: | My man!!! |

40.     The following day, on or about August 16, 2016, MERRITT and SLATER had the following conversation by text message:

| | |
|---|---|
| MERRITT: | Yo Yo don't forget to check Charles stuff out.  Then hit me. |
| SLATER: | He still owe the same missing returns for both April thru July then a balance of 6k on 1717 & 1400 on 1720 how he gonna |

get a clean hands?

MERRITT:         Idk bout to call you

41.     Immediately after MERRITT's message stating that he was about to call SLATER, MERRITT, SLATER, and Zhou participated in a three-way phone call. Later that same day, MERRITT texted SLATER, writing, "We in with Charlie for Thursday . . . That's for the clean hands then later we start the process for what's owed."

42.     Two days later—on or about Thursday, August 18, 2016—MERRITT texted Zhou, "Hey bro. Just left Tax. V Ready? Call me back. We keep missing each other." MERRITT and Zhou and MERRITT and SLATER then exchanged several phone calls. At approximately 1:10 p.m., MERRITT sent SLATER a text message that he was "[h]eaded to Charlie now 10 mins away from him." Then, at approximately 1:45 p.m., MERRITT texted SLATER again, writing, "15 min away fool."

43.     On or about August 20, 2016, Zhou sent MERRITT a text message, "you bro. u got the clean hands?" MERRITT responded, "Yep I got it." Zhou replied, "okay. asia and eden both clean hands?" MERRITT responded, "Yes sir!! Your boy called me like 20 times bra[.]"

*SLATER's Fraudulent Acts and Adjustments for Multiple Entities in September 2017*

44.     In or about September 2017, in exchange for the cash payments he received from Zhou through MERRITT, SLATER fraudulently eliminated tax and tax-related liabilities of businesses owned by Zhou, and by Zhou and DE MOYA, as follows:

45.     In or around September 2017, MERRITT and SLATER made it known to Zhou that OTR was preparing to transition sales and use taxpayer accounts from ITS to MITS, and that Zhou would need to properly file and pay taxes once MITS was in place.

46.     In advance of the transition, Zhou agreed to pay MERRITT and SLATER approximately $5,000 to close the tax account of 1720 I LLC and to fraudulently eliminate the liabilities of his other operating businesses.

47.     On or about September 19, 2017, MERRITT and Zhou exchanged the following text messages:

MERRITT:    Ok bro your good just talked to V . Also he wants you to write a letter saying the business is resolved so he can turn it in

Zhou:       which business..asia?

MERRITT:    Yep . . . .He just texted me

Zhou:       okay thks

MERRITT:    I'll just hook up with you around 3 before he leaves . Is that cool?

Zhou:       can u see if u can help me to push to friday meet up? Kind of tight this week

MERRITT:    Ok I'll hit him now

MERRITT:    Ok said he can do $500 today and Friday the rest.  He said that's bc the girl already did her part but he can wait for his on Friday

Zhou:       I can meet u tmr for 500. I am off today . . . coo?

MERRITT:    Ok no problem I'm off too bro lol

48.     The next day, on or about September 20, 2017, at approximately 3:42 p.m., SLATER caused a fraudulent adjustment to Zhou Hospitality Group LLC's account in ITS by abating a $3,437.53 tax liability for the January 2017 tax period.

## SLATER'S Acts on behalf of Businesses
## Owned by Amirshahi or Amirshahi and DE MOYA

49.     Between in or about August 2015 and in or about October 2017, SLATER fraudulently reduced the tax and tax-related liabilities of Amirshahi's businesses, in exchange for cash payments made by Amirshahi directly, or through MERRITT and DE MOYA, as follows:

*SLATER's Fraudulent Adjustments and Offer in Compromise*
*for Toppromo, Inc. in September 2015*

50.     In or about August 2015, Amirshahi discussed with one of his business partners and with DE MOYA that, as a result of an audit, Toppromo, Inc. had been assessed a sales and use tax deficiency of more than $175,000.

51.     On or about September 8, 2015, DE MOYA provided MERRITT with the name of the OTR auditor and supervisor handling the Toppromo, Inc. tax deficiency. MERRITT texted DE MOYA, "We will make it work bra. We always do." DE MOYA replied, "U da man."

52.     On or about September 9, 2015, MERRITT texted DE MOYA, "Hey bra GM. I got back late last night. I need the EIN NUMBER." DE MOYA sent a message to one of Amirshahi's business partners in Toppromo, Inc. requesting the taxpayer identification number for Toppromo, Inc. At approximately 10:13 a.m., DE MOYA sent MERRITT Toppromo, Inc.'s taxpayer identification number.

53.     Less than 90 minutes after receiving the taxpayer identification number on or about September 9, 2015, MERRITT texted DE MOYA, "Cross your fingers man I just met with them now." DE MOYA replied, "Cool. Make it happen." At approximately 11:38 a.m., SLATER browsed the account of Toppromo, Inc. Later that day, DE MOYA texted MERRITT, "How we lookin?" MERRITT replied, "He spoke to the [auditor]. He will defiantly have word on the price and what we have to do tomorrow."

54.     At approximately 8:53 a.m. on or about September 10, 2015, MERRITT texted DE MOYA, "Just got word on payment. We need to meet up . Let me know whenever is good." DE MOYA replied, in part, "Where u at around 1pm tomorrow?"

55.     On or about September 15, 2015, beginning at approximately 9:40 a.m., MERRITT and DE MOYA exchanged the following text messages:

MERRITT:     GM BRO.  Any word yet.  V just texted me.

DE MOYA:     I know 90 was number.  Can we get it closer to 80?

MERRITT:     Let me text them now.  Give me 10 min

DE MOYA:     K

56.     On or about September 21, 2015, MERRITT texted DE MOYA, "Hey bro they almost done.  It might be done around 5 today.  But if not today, for sure tomorrow."

57.     On or about September 22, 2015, SLATER browsed the account of Toppromo, Inc., which had been updated to show that, as a result of penalties and interest from the sales and use tax audit assessment, the business's liabilities exceeded $254,000.

58.     On or about September 25, 2015, at approximately 9:22 a.m., MERRITT texted DE MOYA, "GM BRO.  Hope All Is Well. I'll see you at 11. Meet you at the Starbucks Safeway." At approximately the same time, SLATER browsed the account of Toppromo, Inc.

59.     On or about September 28, 2015, at approximately 10:32 a.m., DE MOYA texted MERRITT, "Ok. I am here.  Partners want to see paperwork.  Any way you could take a picture of it?"  At approximately 10:55 a.m., MERRITT sent DE MOYA a text message containing a photograph of an OTR Statement of Account for Toppromo, Inc.  It showed a balance of $258,652.87. Approximately $255,000 of the balance was attributable to the sales and use tax audit

assessment, plus penalties and interest. MERRITT further texted, "When you look at it call me bro. I'm done from the meeting." DE MOYA forwarded the image to Amirshahi.

60.     On or about September 29, 2015, between 11:18 and 11:24 a.m., SLATER caused a reversal in ITS of approximately $216,000 in the audit-related liabilities of Toppromo, Inc. that had been entered on September 22, 2015. At approximately 11:35 a.m., SLATER browsed Toppromo, Inc.'s account in ITS, and requested a statement of account showing a total balance due of approximately $42,000, of which about $40,000 was attributable to the sales and use tax audit assessment plus penalties and interest.

61.     On or about September 29, 2015, at approximately 2:21 p.m., DE MOYA texted MERRITT, "We just checked. This is what's showing up." The attached image depicted Toppromo, Inc.'s account as depicted on the OTR website, with sales and use tax and tax-related liabilities still in the range of $256,000. DE MOYA texted MERRITT, "Send me a pic of letter." At approximately 2:45 p.m., DE MOYA texted Amirshahi and his business partner a photograph of a Statement of Account for Toppromo, Inc., dated September 29, 2015, showing total liabilities of approximately $42,000, of which about $40,000 was attributable to the sales and use tax audit assessment plus penalties and interest.

62.     At about 3:25 p.m. on or about the same date, September 29, 2015, DE MOYA also texted Amirshahi and his business partner a photograph of an Offer in Compromise Acceptance Notification on OTR letterhead. According to the document, OTR agreed to accept a $40,000 settlement offer by Toppromo, Inc. to resolve its outstanding sales and use tax liabilities, with the amount due to be paid through a six-month payment plan. The document stated that it was authorized by "Vincent Slater," who was falsely identified as "Supervisor, Collection Division." The document bore the initials "VNS."

63.    On or about October 10, 2015, Amirshahi gave cash to DE MOYA to make a payment to SLATER, either directly or through MERRITT, in exchange for SLATER's fraudulent reduction of Topppromo, Inc.'s tax and tax-related liabilities by more than $216,000.

64.    On or about October 15, 2015, MERRITT texted DE MOYA, "GM Bro. Hope All Is Well . Just got a text from Vince. He said we have to finish the rest ASAP. Don't ask me why bro. Anyway i haven't responded. Just hit me later. no rush." DE MOYA forwarded the message to Amirshahi and to two of his business partners in Toppromo, Inc.

*SLATER's Fraudulent Adjustments for Barcode Corporation from March 2016 to October 2017*

65.    On or about November 3, 2015, Amirshahi texted DE MOYA asking him to stop an OTR audit of another of Amirshahi's businesses, Barcode Corporation.

66.    On or about November 4, 2015, Amirshahi sent a message to DE MOYA, "Anything on barcode?" DE MOYA replied, "Working on it."

67.    On or about November 14, 2015, Amirshahi sent a message to MERRITT asking, "Anything on the other major situation???" MERRITT replied, "I have news but I will know 100% on Tuesday . I have a meeting with my guy and the lady ."

68.    On or about Tuesday, November 17, 2015, Amirshahi texted MERRITT that the auditor called and wanted to start "this Friday[.]" MERRITT replied, "I know bro. I'm here now hang on. I'll call you around 12." Approximately two and one-half hours later, MERRITT texted Amirshahi, "Still here doing your lawyer shit." Amirshahi texted MERRITT to "Stop talking so much," and further stated that "they should have cleared us due to last time."

69.    Between in on or about November 2015 and in or about March 2016, MERRITT advised Amirshahi that Barcode Corporation should not report its sales and use taxes.

70.     Between in or about January 2016 and in or about March 2016, Amirshahi caused Barcode Corporation not to report or pay its monthly sales and use tax obligations for tax periods including December 2015, January 2016, and February 2016.

71.     On or about March 14, 2016, Amirshahi caused Barcode Corporation to report but not pay its monthly sales and use tax obligations of approximately $62,000 (including interest and penalties) for the tax periods of December 2015 and January 2016.

72.     On or about March 17, 2016, SLATER caused ITS to generate a Statement of Account reflecting that Barcode Corporation had outstanding liabilities totaling $79,823.70. These liabilities included Barcode Corporation's December 2015 and January 2016 sales and use tax and tax-related liabilities, as well as audit assessments for multiple additional tax periods and a ballpark fee.

73.     The same day, on or about March 17, 2016, SLATER caused multiple fraudulent adjustments to Barcode Corporation's ITS account, writing off Barcode Corporation's December 2015 and January 2016 sales and use tax and tax-related liabilities, and reversing and reducing the audit assessments and ballpark fee, resulting in Barcode Corporation's having zero outstanding liabilities. SLATER then caused ITS to generate a Statement of Account for Barcode Corporation stating, "You have no current outstanding liabilities."

74.     On or about March 18, 2016, DE MOYA sent Amirshahi a photograph of an OTR Statement of Account for Barcode Corporation stating, "You have no current outstanding liabilities." Amirshahi texted DE MOYA that he wanted "settlement in full letter" similar to the Offer in Compromise that Toppromo, Inc. received. DE MOYA responded, "Killing me… Bro, what do you want to do[?] The guy is blowing me up for the other 10k." Amirshahi replied, "I will get it. Today." A short time later, DE MOYA texted, "Let's get him the 10k today. Then I will

express concerns. But he has already put it in the system." Amirshahi replied, "K." A few hours later, Amirshahi texted DE MOYA, "When should I meet u[?]" DE MOYA instructed Amirshahi to call MERRITT directly.

75.    On or about March 21, 2016, MERRITT texted Amirshahi, "Hey bro. Talked to Dre. What time do you want to link up. TAX guy is blowing me up." Amirshahi responded, "Ok. Anytime. I need settlement paper/not what you sent. Please make clear to him. But I am ready." MERRITT then met Amirshahi at a bar in Washington, D.C., where Amirshahi paid cash to MERRITT to provide to the OTR employee—SLATER—who had wiped out a portion of Barcode's tax and tax-related liabilities.

76.    Thereafter, until in or around October 2017, Amirshahi made cash payments to SLATER through MERRITT on a near monthly basis for the purpose of eliminating Barcode Corporation's on-going tax and tax-related liabilities. For example, in or about mid-September 2016, MERRITT and SLATER exchanged the following conversation by text messages regarding Barcode Corporation:

| | |
|---|---|
| MERRITT: | Bout to meet with Armon at barcode to see what's the deal |
| SLATER: | Ok we on EIN [Barcode Corporation's taxpayer identification number] |
| MERRITT: | Yo did you get the info. Let Me know I'm around |
| SLATER: | Yea he ain't file August yet & Sept not due until Oct he has a balance he was suppose to pay on May but he didn't which is 11k |
| MERRITT: | Yeah he mentioned that yesterday. I think he's under the impression that we was going to take care of that. He wants us to give him a deal on the the one coming up and the one that needs to filed now. You come up with the best price for us. |
| MERRITT: | Let me know soon as you can |
| SLATER: | I just doubled check he owe 30+ grand on his corp |

SLATER:     What he say?

MERRITT:    Going to talk to him in person later today. To be honest man he need
            us so Ima make him know who's boss. So Imma make him wait until
            I see him today.

77.     Additionally, on or about September 26, 2017, between approximately 12:09 and
12:19 p.m., SLATER caused a fraudulent credit in ITS in the amount of $15,692.70 in Barcode
Corporation's August 2013 sales and use tax period by reducing gross receipts for that period, and
he then forwarded the resulting credit to pay liabilities owed for the August 2017 tax period.

78.     Between on or about April 2016 and October 2017, Amirshahi made a cash payment
directly to SLATER at Barcode in exchange for SLATER's reduction and elimination of on-going
sales and use tax and tax-related liabilities for Amirshahi's businesses.

*SLATER's Fraudulent Adjustment for 727 Concept LLC in June 2017*

79.     On or about April 27, 2017, MERRITT and Amirshahi texted SLATER about
eliminating the tax liability of one of Amirshahi's businesses, 727 Concept LLC, in exchange for
the payments to SLATER from Amirshahi:

MERRITT:    When do you want to take care of these accounts he said bro ?

Amirshahi:  Small one is on you. It's small.

Amirshahi:  There is no other one

MERRITT:    Ok he can do the small one whenever your ready

Amirshahi:  Ready for what lol?

Amirshahi:  It's 1500

Amirshahi:  It was part of discussion

Amirshahi:  Tell him to do it please

MERRITT:    Hang on

| | |
|---|---|
| Amirshahi: | Very very small |
| MERRITT: | Killing me |
| MERRITT: | Ok he said $1,500, he just checked it. |
| Amirshahi: | That's all it was…. a bounced check. |
| Amirshahi: | We only owed that… |
| MERRITT: | He said if your ready he will do it right now he leaves at 7 today |
| MERRITT: | He said no big deal he has to ask the girl tomorrow who does that. She's gone for the day. He will check 1st thing tomorrow with her |

80.     On or about June 23, 2017, at approximately 4:40 p.m., SLATER caused a $6,479.89 fraudulent tax credit in ITS for 727 Concept LLC by reducing its gross receipts for its May 2016 tax return—which had been properly filed and paid—to zero, and then used a portion of the resulting credit to satisfy 727 Concept LLC's delinquent tax and tax-related liabilities from February 2017.

*SLATER's Fraudulent Adjustment for Ekho Events, Inc. in July 2016*

81.     On or about July 13, 2016, MERRITT and DE MOYA had a brief phone call.  Then, MERRITT sent DE MOYA a text message stating, "V just sent me this.  He said ready when u are bro."  DE MOYA asked, "What's the damage?"  MERRITT replied, "Yea, we need to move fast that's a old one too from Dec."

82.     On or about July 14, 2016, SLATER browsed the ITS account of Ekho Events, Inc., a company partially owned by DE MOYA (and Amirshahi).  SLATER then caused three fraudulent offsets and an abatement to Ekho Events, Inc.'s account, totaling approximately $73,924, to satisfy the business's sales and use tax and tax-related liabilities for the December 2015 tax period.

83.     Later on or about July 14, 2016, after these adjustments, SLATER and MERRITT

had a phone call lasting more than 6 minutes.  Also on or about July 14, 2016, MERRITT sent a

text message to DE MOYA stating, "GM BRA.  Account Done.  V just texted me."

84.     On or about August 1, 2016, MERRITT sent a text message to DE MOYA, writing,

"Yo Yo V blowing me up.  What u want me to say bro.?"  As MERRITT waited on DE MOYA's

response, MERRITT and SLATER exchanged the following text messages:

| | |
|---|---|
| SLATER: | I guess no word huh |
| MERRITT: | Just texted him again.  Still waiting man.  It's always something with these guys. |
| SLATER: | Yep I see . . . smh always want something but never want to do what they need to do |

85.     Later that same day, on or about August 1, 2016, after MERRITT and DE MOYA

spoke on the phone, MERRITT and SLATER had the following conversation by text message:

| | |
|---|---|
| MERRITT: | He just called. He bout ready I think. |
| SLATER: | Well hit me |
| MERRITT: | Most definitely soon as I get word.  Man they know they got it SHIT!! Next time if next time. PAID IN FULL!! |
| SLATER: | Upfront |

86.     On or about August 1, 2016, SLATER asked MERRITT if he had "[a]ny luck."

MERRITT responded that he was going to meet DE MOYA the following day at noon.

87.     On or about August 3, 2016, MERRITT and SLATER discussed by text message

that DE MOYA had not provided the full promised amount of cash:

| | |
|---|---|
| MERRITT: | Man I counted that shit and it's all over the place it was two short but I took an extra 1 out of mines. I just called him about that. So when u get home you gonna have to count it again bc it's all mixed up with 50s and 20s . But it's 5k tho |

MERRITT:     It was 4

SLATER:      So he was short

MERRITT:     Yea 1k . But don't sweat it I'll handle that ASAP . I just left him a
             message . I didn't want to count it in front of my sons mom. No hands
             out . Shit I been suffering for 3 weeks buying SHIT

88.     On or about August 10, 2016, SLATER texted MERRITT, "What Dre say?"
MERRITT responded, "Dead today no response said his kid sick that was it. I'll get him tho. He
straight up guy."

*SLATER's Fraudulent Adjustments for Ekho Events, Inc. in September 2016*

89.     On or about September 30, 2016, at 10:31 a.m., SLATER sent a text message to DE
MOYA, writing, "This V tax office." DE MOYA responded, "Locking you in." SLATER replied,
"Cool."

90.     Also on or about September 30, 2016, SLATER caused a fraudulent abatement of
Ekho Events, Inc.'s outstanding 2015 corporate franchise tax liabilities. At around the same time,
DE MOYA and MERRITT and MERRITT and SLATER exchanged several phone calls.

91.     Also on or about September 30, 2016, DE MOYA sent text messages to Amirshahi
containing photographs of documents from OTR, including a letter from OTR stating that Ekho
Events, Inc. had no outstanding liabilities and a Clean Hands certificate.

### SLATER's Cash Deposits

92.     Between in or about November 2013 and in or about October 2017, SLATER made
at least 114 cash deposits into his bank accounts at TD Bank and Industrial Bank, totaling
$86,726.56. At least 60 of the deposits were made in amounts of $500 or more, totaling $75,202.

(In violation of Title 18 United States Code, Section 371.)

## COUNT TWO
### (Bribery – 18 U.S.C. §§ 201(b)(2) and 2)

93.     Paragraphs 1 through 16 and paragraphs 22 through 92 of this Indictment are re-alleged and incorporated as though set forth herein.

94.     From in or about March 2012 through in or about December 2017, in the District of Columbia and elsewhere, defendant

### VINCENT SLATER,

being a public official, aided and abetted by defendant **ANTHONY MERRITT**, did, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another person, in return for SLATER being influenced in the performance of any official act and being induced to do and omit to do any act in violation of his lawful and official duty; that is, SLATER, aided and abetted by MERRITT, sought and received money from Zhou, Amirshahi, and DE MOYA in return for SLATER being influenced in the performance of official acts and being induced to violate lawful and official duties to OTR in order to help businesses associated with Zhou, Amirshahi, and DE MOYA by, among other things, fraudulently reducing the tax and tax-related liabilities of those businesses.

(In violation of Title 18, United States Code, Sections 201(b)(2)(A) & (C) and 2.)

## COUNT THREE
### (Bribery – 18 U.S.C. §§ 201(b)(1) and 2)

95.    Paragraphs 1 through 16 and paragraphs 22 through 92 of this Indictment are re-alleged and incorporated for should be forth herein.

96.    From in or about July 2016, through in or about December 2017, in the District of Columbia and elsewhere, the defendant

**ANDRE DE MOYA**

aided and abetted by defendant **ANTHONY MERRITT**, directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with the intent to influence any official act and to induce such public official to do and omit to do any act in violation of his lawful and official duty; that is, DE MOYA, aided and abetted by MERRITT, paid SLATER money to influence SLATER in the performance of official acts and to induce SLATER to violate lawful and official duties to OTR in order to help businesses associated with Zhou, Amirshahi, and DE MOYA by, among other things, fraudulently reducing the tax and tax-related liabilities of those businesses.

(In violation of Title 18, United States Code, Sections 201(b)(1)(A) & (C) and 2.)

## COUNTS FOUR THROUGH NINE
### (Money, Property, and Honest Services Wire Fraud – 18 U.S.C. §§ 1343 and 1346)

97.     Paragraphs 1 through 16 and paragraphs 22 through 92 of this Indictment are re-alleged and incorporated as though set forth herein.

98.     From in or about March 2012 through in or about December 2017, in the District of Columbia and elsewhere, the defendants

**VINCENT SLATER,**
**ANTHONY MERRITT, and**
**ANDRE DE MOYA**

and Zhou and Amirshahi, did devise and intend to devise a scheme and artifice to defraud the District of Columbia of money and property, and to defraud and deprive OTR and the District of Columbia and its citizens of their intangible right to SLATER'S honest services through bribery and kickbacks.

99.     On or about the dates specified as to each count below, in the District of Columbia and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud, the defendants and others did knowingly and willfully transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds; that is, each time that SLATER caused a fraudulent adjustment in ITS, including those described below, he caused a wire to be transmitted from the District of Columbia to Virginia:

| Count | Date | Description of Wire |
|-------|------|---------------------|
| 4 | 9/29/2015 | Fraudulent adjustment to Toppromo, Inc.'s December 2014 tax return information to reverse a $93,304.15 audit assessment that had been entered for that period on September 22, 2015. |
| 5 | 1/27/2016 | Fraudulent adjustment to 1716 I LLC's June 2010 tax return information to reduce the business's gross receipts to $0. |
| 6 | 7/14/2016 | Fraudulent adjustment to Ekho Events, Inc.'s November 2012 tax return information to create a tax credit of $30,000. |
| 7 | 6/23/2017 | Fraudulent adjustment to 727 Concept LLC's May 2016 tax return information to create a tax credit of $6,479.89. |
| 8 | 9/20/2017 | Fraudulent adjustment to Zhou Hospitality Group LLC's January 2017 tax return information to abate a $3,437.53 liability. |
| 9 | 9/26/2017 | Fraudulent adjustment to Barcode Corporation's August 2013 tax return information to create a tax credit of $15,692.70. |

(In violation of Title 18, United States Code, Sections 1343 and 1346.)

## CRIMINAL FORFEITURE ALLEGATION

1.      Upon conviction of any of the offenses alleged in Count One through Count Nine of this Indictment, the defendants,

**ANDRE DE MOYA,**
**ANTHONY MERRITT, and**
**VINCENT SLATER**

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18 United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  The United States will also seek a forfeiture

28

money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

      2.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property that cannot be divided without difficulty,

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

    (Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).

A TRUE BILL:

FOREPERSON

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA